**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BRADLEY R. ETHERIDGE,

          Plaintiff,

          v.

NOVO NORDISK INC.,

          Defendant.

Civil Action No. 19-13676 (MAS) (DEA)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

      This matter comes before the Court on Defendant Novo Nordisk Inc.'s ("Novo") Motion for Summary Judgment. (ECF No. 26.) Plaintiff Bradley R. Etheridge ("Etheridge") opposed, and Novo replied. (ECF Nos. 24, 25.)[1] The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants Novo's Motion.

---

[1] The parties submitted a sur-reply (ECF No. 34) as well as an opposition to the sur-reply (ECF No. 36). Although such submissions are restricted by Local Civil Rule 7.1(d)(6), the Court nevertheless considered the arguments raised in the parties' supplemental submissions. *See* L. Civ. R. 7.1(d)(6).

I.    **BACKGROUND**[2]

   A.    **Etheridge's Employment at Novo.**

   Etheridge started his employment with Novo in March 2003 and worked at the company for over fifteen years. (Pl.'s Suppl. Statement of Material Facts ("SSMF") ¶¶ 1-2, ECF No. 30.) By the mid-to-late 2010s, he was the Director of the Diabetes Education Program. (SSMF ¶ 3; Pl.s Opp'n Br., Ex. 1 at 86:1-4 ("Etheridge Dep."), ECF No. 30-1.) In that role, he was tasked with overseeing the strategic direction of Novo's educational engagements with healthcare professionals in the northeast United States. (SSMF ¶ 4 (citing Etheridge Dep. Tr. 86:8-21, 91:22-25, 92:2-9).) Six or seven regional managers reported to Etheridge. (SSMF ¶ 3; Etheridge Dep. Tr. 86:8-21.) Relevant to his lawsuit, Etheridge is (and at the time of his employment at Novo, was) openly gay. (SSMF ¶ 16.)

   One of those regional managers that reported to Etheridge was Matt Sebastian ("Sebastian"). (SSMF ¶ 7; Etheridge Dep. Tr. 150:11-25.) Etheridge directly managed Sebastian continuously since 2014 as well as on and off beforehand. (Etheridge Dep. Tr. 150:11-25, 151:18-25.) For several years, the two had a positive working relationship. (*Id.* at 181:3-23.) But that relationship soured in late-2017 and early-2018, when Etheridge gave Sebastian a negative year-end review and reported him for expense report issues due to alcohol purchases. (SSMF ¶ 8; SSMF Ex. 4, ECF No. 30.) After this point, Etheridge noticed that Sebastian became "defiant" with him at work. (Etheridge Dep. Tr. 73:16-17.) Rod Boone ("Boone"), another one of Etheridge's direct reports, told Etheridge that Sebastian shared with him in the wake of his negative performance review that Sebastian "got shit" on Etheridge. (*Id.* at 74:1-8.) In hearing this,

---

[2] On a summary judgment motion, the Court will "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

Etheridge thought Sebastian may have been referencing potentially "inappropriate" conversations they had in the past. (*Id.* at 74:15-22.)

Around the same time, in late 2017, Dave Moore ("Moore") joined Novo's management and brought in new leadership. (*See id.* ¶ 78; Etheridge Dep. Tr. 34:1-8.) Etheridge described the newcomers as "less loose, drier, [and] more serious," bringing in a "different culture." (Etheridge Dep. Tr. 33:7-17, 34:1-20, 82:4-20.) Under Moore was Louis Pascarella ("Pascarella"), who joined Novo in November 2017 as an Area Commercial Leader and directly supervised Etheridge. (SSMF ¶ 5; Pl.'s Ex. 17, at 10:8-24 ("Pascarella Dep."), ECF No. 30-1.) Etheridge did not feel as if Pascarella liked him, recalling that Pascarella was "more engaged" with his other direct reports and generally had more interest in their work. (SSMF ¶ 77.) Etheridge also felt that Moore was uncomfortable around him based on their few encounters. (Etheridge Dep. Tr. 145:13-25, 146:1-25.) Etheridge got this feeling from two events in December 2017—(1) a company conference where Moore told Etheridge that he should not "feel obligated" to socialize alongside Moore with other guests, and (2) a company bowling event where Moore "moved away" from Etheridge and a few minutes later asked Pascarella whether Etheridge was going to "make it under [Pascarella's] leadership."[3] (*Id.* at 145:13-25, 146:1-25, 147:1-24.)

In January 2018, Novo held a conference in Chicago to celebrate the launch of a new drug, Ozempic. (Etheridge Dep. Tr. 122:4-11; SSMF ¶ 41.) The company held several competitions during the conference with various prizes. (Etheridge Dep. Tr. 132:3-22; SSMF ¶ 52.) One points-based competition involved mock educational drills during which Etheridge was "the most senior person in the room." (Etheridge Dep. Tr. 125:22-25, 126:1-21.) Realizing his region was

---

[3] Etheridge did not disclose to Moore or Pascarella that he was gay prior to these events, nor could he say whether they knew Etheridge was gay. (Etheridge Dep. Tr. 147:16-25, 148:1-16.)

"tremendously down," Etheridge suggested to his group that they allow those within the group already winning to collect more points rather than award points based on merit. (*Id.* at 129:1-15, 130:15-23.) His team verbally agreed, and Etheridge carried out this strategy. (*Id.*) Pascarella twice visited Etheridge's room during the multi-day conference and Etheridge recalls that, during the last day, Pascarella joined him in directing points to certain members of Etheridge's team. (*Id.* at 132:16-25, 133:1-20.) Unrelated to Etheridge's game, there were allegations throughout the drug launch conference that other employees were also manipulating separate contests to win prizes. (SSMF ¶ 52; Pl.'s Opp'n Br. Ex. 10, at 24:1-7 ("Gomes Williams Dep."), ECF No. 30-1.)

Not all participants were happy with how Etheridge managed the competition. (*See* Def.'s Moving Br. Ex. J ("Anonymous Complaint"), ECF No. 26-4.) A few weeks after the Chicago conference, Novo's Human Resources Department received an anonymous complaint about Etheridge's conduct during the competition.[4] (*Id.*) Nadine Gomes Williams ("Williams"), Director of Employee Relations, investigated the anonymous complaint. (Def.'s Moving Br. Ex. K, at 1-2, ECF No. 26-4; SSMF ¶ 20.) When asked by Williams, Etheridge confirmed the allegation was true and Williams replied that he should not worry about it. (Def.'s Moving Br. Ex. K, at 1-2; *see also* Etheridge Dep. Tr. 132:3-22; SSMF ¶ 51.) Shortly after, Williams concluded the investigation in March 2018 and found that Etheridge's conduct during the conference violated company policy, which reflected "poor leadership and judgment" on his part. (Def.'s Moving Br. Ex. K, at 2.) Several days later, on April 4, 2018, Pascarella issued a verbal warning to Etheridge after

---

[4] In a brief, multipage handwritten note, the complainant stated that at the Chicago launch conference, "cheating and dishonesty occur[ed]" because "[Etheridge] chose certain [employees] to award points to." (*See id.*) The complainant also expressed feeling unable to speak up (*id.* ("What were we who had been slighted all along to say?")), and discontent with how the competition was managed (*id.* "[h]ow sad and discouraging it is to see just favoritism and inequity in action!")).

discussing it with Williams. (*See* Def.'s Moving Br., Ex. L, ECF No. 26-4; SSMF ¶ 40.) According to Etheridge, Pascarella said that the verbal warning was for how Etheridge played the company game in Chicago but that, ultimately, it "was not a big deal." (SSMF ¶ 42.) Instead, Pascarella chose to give a verbal warning to Etheridge "to send a signal that [he] [was] too close and too emotional with [his] team." (*Id.* (citing Etheridge Dep. Tr. 98-99).) Pascarella later echoed during the same meeting that he believed Etheridge was "extremely smart" and a "very bright guy," but his emotions have "gotten in the way of [Etheridge] becoming even a [Vice President]." (*Id.* (citing Etheridge Dep. Tr. 101-02).) As the two were leaving the meeting, Pascarella told Etheridge that he was "very memorable."[5] (*Id.* ¶ 49.)

### B.     Novo Receives a #MeToo Complaint About Etheridge.

Around the same time that Novo was investigating Etheridge's conduct at the Chicago drug launch conference, another issue was brewing. (*See* SSMF ¶ 40.) On March 8, 2018, Sebastian was texting with a group of Etheridge's direct reports when he sent the following messages:[6]

> Do y'all know Brad [Etheridge] referenced you in his comments for my y[ear]-end review? It had to do with me being disengaged. He gave a couple of examples, one being our November m[eeting]. The same meeting where we came up with "his" famous targeting algorithm . . . . I think I was "engaged" when I gave him the entire script for that. I'm not venting. You need to know that I'm being bullied, threatened, and your manager[] is actively trying to cripple me. #MeToo #StopBullying.

(Def.'s Moving Br., Ex. G, ECF No. 26-4.) Someone forwarded the conversation to Etheridge the next day. (SSMF ¶ 13; Etheridge's Dep. Tr. 152:11-22.)

---

[5] Etheridge contends that this was the first time he felt discriminated against by a supervisor at Novo based on his sexual orientation. (*Id.* ¶¶ 45-46.)

[6] Although appearing as one lengthy message below for readability purposes, Sebastian in fact sent a series of separate, uninterrupted messages to the group.

Etheridge read Sebastian's "#MeToo" comment as alleging sexual harassment, in part due to the larger social movement that was prevalent at the time and in part because when Etheridge "put the pieces together," he thought the accusation could have been predicated on the extended time the two spent together during work events, their "socializ[ing]," "jokes," and conversations that turned "saucy or . . . sexual in nature." (Etheridge Dep. Tr. 54:3-14, 60:19-25, 61:1-24; SSMF ¶ 15.) Specifically, Etheridge recalled conversations that resembled "locker room talk." (Etheridge Dep. Tr. 61:7-16.) Coming to this realization, the next day, Etheridge forwarded the text messages to Williams and Rebecca Viola in Employee Relations and subsequently called them about it. (SSMF ¶ 20; Etheridge Dep. Tr. 58:19-20.)

As a result, Employee Relations launched an investigation into the allegation and began to interview witnesses. (SSMF ¶ 25; Pl.'s Opp'n Br., Ex. 9 ("Viola March 14, 2018 Email"), ECF No. 30-1.) First, Novo spoke with Sebastian. (Viola March 14, 2018 Email.) He originally was hesitant to discuss what he meant by "#MeToo" but later explained that although Etheridge never "made sexual advances towards [Sebastian]," he did have "multiple uncomfortable conversations and situations with [Etheridge] over the years." (Viola March 14, 2018 Email.)

Based on this interview, Novo engaged its Equal Employment Opportunity investigator Lisa Piccinetti ("Piccinetti") to investigate the allegations. (SSMF ¶ 55.) Piccinetti interviewed Sebastian in early April 2018. (*See generally* Pl.'s Opp'n Br., Ex. 21 ("Piccinetti Interviews").) In that interview, Sebastian stated that Etheridge engaged in "inappropriate behavior," including (i) telling Sebastian to Google sexual terms (*id.* ("Brad [Etheridge] would giggle and laugh and say, 'Do you know what rosebud means? Google it.'")); (ii) discussing sexual acts with Sebastian (*id.* ("he talked about sex acts and sexual situations")); (iii) describing sexual encounters between himself and his partner (*id.* ("[h]e talked about 'going at it' and his friend had a hard time

6

walking")); (iv) asking about sexual experiences with women (*id.* (Etheridge asked about "[w]hen women squirt during sex")), and (v) bullying Sebastian after he stopped "putting up with [Etheridge's] behavior." (*Id.*) Generally, Sebastian described to Piccinetti that Etheridge was "drinking a lot back then" and had "many conversations about sex, porn, masturbation, gay sex, [and] straight sex." (*Id.*) When prompted on whether Sebastian ever faced uncomfortable experiences with Etheridge, Sebastian described a conference in Las Vegas a few years before where Etheridge told him to stop working, saying, "[l]et's hang out[,] [c]ome up to my room." (*Id.*) Sebastian stated that when he went up to Etheridge's room, he was "surprised to see [Etheridge] in a towel" when he opened the door and Etheridge "wanted [Sebastian] to put lotion on his back." (*Id.*) Sebastian noted that most of the instances occurred several years in the past and some as far back as five years. (*Id.*) He told Piccinetti that he did not raise the issue earlier because Etheridge was his manager and a good person, also chalking it up to "locker room talk" at the time. (*Id.*)

On Piccinetti's questioning of whether any other employee would be helpful to talk with as part of Novo's investigation, Sebastian named other individuals that "were exposed to a lot of this stuff." (*Id.*) This comment sparked Piccinetti to interview Boone regarding the allegations, which culminated in Boone recommending she speak with Jennifer Paul ("Paul"), an employee still with the company. (Pl.'s Opp'n Br., Ex. 20 ("Piccinetti Dep."), at 46:21-24.) So, Piccinetti then spoke with Paul, who informed her that Etheridge brought up inappropriate or offensive things "multiple times." (Piccinetti Interviews ("We had conversations about things that weren't appropriate and he shouldn't have talked to us about. . . [a] lot about his social life and things that he did with his partners . . . intimate details.").) Paul further said that many conversations were sexual, particularly when alcohol was involved. (*Id.*) But she did note that most of these

occurrences happened several years before, when she first reported to Etheridge, and that she did not feel like she personally was being harassed. (*Id.*)

As the investigation was ongoing, Etheridge followed up with Employee Relations multiple times. (*E.g.*, SSMF ¶¶ 21-24.) He told Williams that being accused of sexually victimizing Sebastian "smeared" him as a gay manager at Novo and he took it "personally." (*Id.* ¶ 22 (citing Pl.'s Opp'n Br., Ex. 11 ("Williams March 13, 2018 Notes"), ECF No. 30-1).) Williams thanked Etheridge for coming forward and told him not to speak with Sebastian about the harassment allegations. (*Id.* ¶ 23.) Etheridge continued to contact Williams about it (SSMF ¶ 26), contacted Human Resources about it a week later in early April 2018 (*id.* ¶ 27), and continued "pushing [E]mployee [R]elations to investigate" Sebastian's claim (Etheridge Dep. Tr. 115:1-9). Etheridge also told his boss, Pascarella, about the harassment investigation on several occasions.[7] (Etheridge Dep. Tr. 115:11-25.) Pascarella eventually told Etheridge to stop going to Human Resources about the investigation. (*Id.* at 102:24-25.)

Piccinetti's last witness in her investigation was Etheridge. (SSMF ¶ 58.) In May 2018, roughly two months after Sebastian first sent the "#MeToo" text, that interview occurred. (*Id.*) During it, Etheridge admitted to engaging in prior sexual conversations with his direct reports if they "c[a]me up or in jest" but mostly in "a more social setting . . . after hours in a social setting." (Pl.'s Opp'n Br., Ex. 22 ("Etheridge May 3, 2018 Interview"), ECF No. 30-1.) Etheridge denied or could not recall (but could not rule out) many of the specific comments and allegations made by Sebastian. (Pl.'s Opp'n Br., Ex. 24, at 3-5 ("Piccinetti Report"), ECF No. 30-1.) For a few of the specific allegations, such as telling a direct report to look up sexual terms on the internet, after

---

[7] For example, Etheridge raised the investigation at his April 4, 2018 meeting with Pascarella where he received a verbal warning for his conduct during the Chicago drug launch. (Etheridge Dep. Tr. 98:8-23, 102:17-25.)

further questioning by Piccinetti, Etheridge conceded that he "[couldn't] say [these conversations] didn't happen."[8] (Def.'s Moving Br., Ex. R.) Etheridge also admitted in his interview with Piccinetti that "at some point" he asked Sebastian to put sunscreen on his back and offered a pair of his shorts for use in the pool. (*Id.* at 3-4.)

Piccinetti found Etheridge not credible; she believed he contradicted himself multiple times. (*Id.*) Further, Piccinetti found that Paul corroborated several of Sebastian's specific allegations. (*Id.*) She concluded that it was very likely Etheridge engaged in sexual conversations with subordinates and believed his "actions were unwelcome[d] by [Sebastian]," as well as other direct reports, and Etheridge "created an environment that was hostile and uncomfortable." (*Id.* at 5; SSMF ¶ 63.) Piccinetti determined that Etheridge violated "the Company's EEO & Anti-Harassment Policy," although she noted that a few of the instances occurred several years in the past. (*Id.*) She sent her final report to Human Resources on May 21, 2018. (SSMF ¶ 66.)

### C.     Novo Fires Etheridge.

After reviewing the report's findings, Human Resources and Employee Relations considered whether to issue Etheridge a written warning or terminate him. (*Id.* ¶ 70.) In a meeting on that topic between Williams and Steven McCord ("McCord"), Associate Director of Employee Relations, Williams took notes while the group discussed how to handle the harassment finding. (Pl.'s Opp'n Br., Ex. 27.) Those meeting notes reflect brief bulleted points that Etheridge violated "EEO" policy and that it was "not unwelcomed," which Williams testified the group discussed in considering if Etheridge's conduct was consented to or tolerated by Etheridge's direct reports, but

---

[8] During his deposition, Etheridge admitted that he withheld information during Novo's investigation into his misconduct. (*E.g.*, Etheridge Dep. Tr. 187:21-24 ("Q: You were dishonest when you didn't tell Lisa [Piccinetti] that you had those conversations; is that right?" "A: Yes.") But on a summary judgment motion, the Court is not to weigh credibility and instead focuses on the information Novo was aware of at the time it fired Etheridge rather than what it learned during subsequent discovery.

not a reason she personally found persuasive in deciding how to respond. (*Id.*; Williams Dep. Tr. 91:1-7.) Although unclear whether Williams or McCord first decided termination was the appropriate outcome during their discussion, they jointly conveyed to Pascarella that Etheridge should be fired, citing policy violations as the basis.[9] (Williams Dep. Tr. 77:9-19; Pl.'s Opp'n Br., Ex. 25 ("McCord Depo."), at 36:8-10.) In late May, Human Resources and Employee Relations met with Pascarella to discuss Piccinetti's report. (SSMF ¶¶ 68-69.) It was during that meeting that Pascarella agreed to terminate Ethridge's employment with Novo. (*Id.* ¶ 74.)

> Novo sent Etheridge a termination letter on June 5, 2018. It read as follows:

> > Your termination is due to violating the Company's Equal Opportunity & Anti-harassment Policy. More specifically, Employee Relations recently conducted an investigation, which found that you subjected direct reports to repeated unwelcome behavior and commentary of a sexual nature that made the individuals uncomfortable. The investigation ultimately concluded that your conduct is in violation of the aforementioned policy and demonstrates poor judgment and leadership, for which you have received prior discipline.

(Pl.'s Opp'n Br., Ex. 30 ("Etheridge Termination Letter"), ECF No. 30-1.)

### D.    Procedural Background.

Etheridge sued Novo for sexual orientation discrimination under Title VII and the New Jersey Law Against Discrimination ("NJLAD") and unlawful retaliation under the same laws. (*See generally* Compl., ECF No. 1.) Novo answered the Complaint (ECF No. 5), and the parties engaged in extensive discovery over a nearly two-year period, including depositions of Etheridge,

---

[9] Etheridge claims that "neither McCord nor Williams recommended that [Etheridge] should be fired" because, in their depositions, both recalled the other person raising termination first. (SSMF ¶¶ 71.) A full reading of Williams's testimony clarifies, however, that the two worked together before aligning on a recommendation of termination. (Def.'s Reply Br., Ex. A; Williams Dep. Tr. 89:9-19.)

Pascarella, Moore, Piccinetti and others. The instant Motion followed, to which Etheridge opposed and Novo replied. (ECF Nos. 26, 30, 34.)

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine disputes of material fact exist). "[U]nsupported allegations in . . . pleadings are insufficient to repel summary judgment." *Schoch v. First Fid Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine [dispute] of material fact,' since a

11

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III.   <u>DISCUSSION</u>

Etheridge raises two claims in this suit: violations of both Title VII and NJLAD for sexual orientation discrimination and retaliation. (Compl. ¶¶ 9, 31-42.) The Court addresses each in turn.

### A.   **Etheridge Must Make Out a Prima Facie Case of Employment Discrimination.**

Etheridge asserts that Novo discriminated against him through terminating him, at least in part, based on his sexual orientation.

Title VII of the Civil Rights Act of 1964, in relevant part, provides as follows:

(a) **Employer practices**

It shall be an unlawful employment practice for an employer —

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e-2(a)(1). Discrimination claims brought under Title VII and NJLAD are "controlled by the three-step burden-shifting framework set forth in *McDonell Douglas*."

*Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (citing, among others, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)). Under the *McDonnell Douglas* framework, a plaintiff first must make a *prima facie* case of discrimination; the burden then shifts to the defendant, who must articulate a "legitimate," "nondiscriminatory reasons for its action"; and finally, the burden shifts back to the plaintiff to prove that the employer's "nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Id.* at 842.

Under this theory of discrimination, for a plaintiff to succeed on such a claim under Title VII or NJLAD, he must show that he was subject to purposeful discrimination. *Weldon v. Kraft, Inc.*, 896 F.2d 793, 796 (3d Cir. 1990); *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 249 (3d Cir. 2006). Specifically, to assert a *prima facie* case of discrimination, a plaintiff must allege that (1) he is a member of a protected class; (2) he is qualified for the position; (3) he was subject to an adverse employment action; and (4) "the adverse action was taken under circumstances giving rise to an inference of discrimination." *Ewell v. NBA Props., Inc.*, 94 F. Supp. 3d 612, 620 (D.N.J. 2015). An adverse employment action is something "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment"— in other words, "material." *Tourtellotte*, 636 F. App'x at 842. At the first step, the plaintiff's initial burden of showing *a prima facie* case is "not . . . onerous." *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 507 (3d Cir. 1996) (*quoting Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995)).

If a plaintiff successfully establishes a prima facie case of discrimination, the burden shifts back to the employer-defendant to "articulate some legitimate non-discriminatory reason for the employee's termination." *Byrd v. Lynch*, No. 10-0247, 2011 WL 2680572, at *4 (D.N.J. July 8, 2011) (quoting *McDonnell*, 411 U.S. at 802). The employer can satisfy this "relatively light

burden" by "introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 759 (3d Cir. 1994).

If the defendant succeeds at step two, the burden shifts back to the plaintiff to "show by a preponderance of the evidence that the employer's explanation is pretextual." *Id.* A plaintiff is not required to provide "direct proof" of discrimination, as such evidence is "often unavailable or difficult to find." *Marzano*, 91 F.3d at 507 (citation omitted). But to survive summary judgment, a plaintiff must submit evidence which:

> 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Fuentes*, 32 F.3d at 762. To make this showing, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons." *Tourtellotte*, 636 F. App'x at 842 (internal quotations and citations omitted).

### B.    A Factfinder Cannot Reasonably Conclude that Novo Terminated Etheridge Based on His Sexual Orientation.

The Court starts with whether Etheridge has made out *a prima facie* case of discrimination. To be sure, Novo does not contest that Etheridge falls within a protected class under federal and state law. (*See generally* Def.'s Moving Br., ECF No. 26-1; *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1734 (2020); N.J. Stat. Ann. § 10:5-3.) Nor does Novo challenge that Etheridge is qualified for his position. (*See generally* Def.'s Moving Br.) Indeed, Novo all but concedes this

point on multiple occasions.  (*E.g.*, *id.* at 1 (finding Etheridge to be a "trusted and valued member of management").)

Instead, Novo focuses its efforts on undermining two facets of Etheridge's *prima facie* case: whether Novo's April 2018 verbal warning to Etheridge was an adverse employment action (element three) and whether Etheridge identified sufficient facts such that a reasonable factfinder could infer that Novo terminated his employment because he is gay (element four). (*Id.* at 7-8.) Novo bears the burden of attacking Etheridge's *prima facie* case. *Celotex*, 477 U.S. at 325. Because it is undisputed that Etheridge's termination constitutes an adverse employment action, the only element left unproven is whether there is sufficient evidence to support an inference of discrimination. (*See generally* Def.'s Moving Br.; *Reganato v. Appliance Replacement Inc.*, No. 15-6164, 2017 WL 747463, at *5 (D.N.J. Feb. 27, 2017) ("Plaintiff clearly suffered an adverse employment action when she was terminated.").) Nonetheless, because the verbal warning occurred weeks prior to the termination, the Court still considers whether the verbal warning independently satisfies the adverse action prong.

### 1.    Etheredge Fails to Present a Prima Facie Case.

*First*, the Court agrees with Novo that Ethridge's April 2018 verbal warning does not constitute an adverse employment action. (Def.'s Moving Br. 7-8.) Tellingly, Etheridge does not meaningfully contest this point. (*See generally* Pl.'s Opp'n Br., ECF No. 30-3.)  Even if he did, success on this issue is dubious. *E.g.*, *Henley v. Brandywine Hosp., LLC*, No. 18-4520, 2019 WL 3326041, at *12 (E.D. Pa. July 24, 2019) (written warning without evidence of "materially alter[ing] the terms or conditions of [p]laintiff's employment" is not adverse action); *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 410 (E.D. Pa. 2014) (same). Instead, Etheridge stresses that the verbal warning was unfair treatment predicated on his sexual orientation. Thus, the Court revisits this argument again in discussing the inference of discrimination element.

*Second*, and more at issue, Novo argues that Etheridge failed to meet his burden of providing facts from which a factfinder could infer that Novo terminated him because he is gay. (Def.'s Moving Br. 8-9.) To prevail, Etheridge may point to "a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013); *Cooper v. Thomas Jefferson Univ. Hosp.*, 743 F. App'x 499, 502 (3d Cir. 2018). Alternatively, Etheridge can point to other circumstantial evidence that supports an inference of discrimination. *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 485 (E.D. Pa. 1999); *see also Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994).

Etheridge attempts to provide evidence of both. As to comparator evidence, he highlights several other Novo employees who were penalized for acting "inconsistent with" Novo's Equal Employment Opportunity and Anti-Harassment Policy but were not terminated. (Pl.'s Opp'n Br. 6 (citing SSMF ¶¶ 81-84).) Etheridge provides the following comparators:

- A May 2017 report detailing that a Novo employee sent a nude photograph to another employee from her personal device on one occasion. Williams investigated the incident and found the conduct violated respectful workplace policies and was "inconsistent" with the Equal Opportunity and Anti-Harassment Policy "in that [employee's] conduct could have resulted in complaints of sexual harassment." The employee was issued a written warning. The incident occurred before Pascarella joined the company. (Pl.'s Opp'n Br., Exs. 31, 32.)

- A July 2017 report detailing that a Novo District Business Manager consumed too much alcohol at a dinner and during that outing made comments around coworkers that were "inappropriate" and that "could be considered to be derogatory toward another race and that were sexual in nature." The employee was issued a written warning. The incident occurred before Pascarella joined the company. (Pl.'s Opp'n Br., Exs. 33, 34.)

- An April 2018 report detailing that a Senior District Business Manager admitted to taking off his shirt to show his direct report his chest tattoo. The employee also asked his direct report to tell him about any communications that she had with other managers and sent an email to management alleging the direct report had performance issues after she made a complaint against him. Novo found the Business Manager violated the respectful workplace and anti-retaliation policies and issued a written warning with mandatory training. There is no evidence Pascarella was involved in this decision. (Pl.'s Opp'n Br., Exs. 35, 36.)

- A September 2018 report detailing that an employee asked a coworker to pick up a business contact for work and added that the business contact "likes the ladies" and that the other employee was "single," so she should "take one for the team." Novo found that although the employee stated it was a joke, the comments violated respectful workplace policies and were inconsistent with anti-harassment policies. The employee was issued a verbal warning. There is no evidence Pascarella was involved in this decision. (Pl.'s Opp'n Br., Exs. 37, 38.)

Novo counters that these individuals are neither in the same position as Etheridge with the same supervisors nor did they engage in comparable offenses. In essence, Novo disputes that the comparators were actually "similarly situated." (Def.'s Moving Br. 9.) In any event, to buttress Etheridge's comparators, Novo submits evidence that reflects the company (1) terminated the employment of a male manager in 2017 who made several comments of a sexual nature to a woman in his district and (2) terminated the employment of a male director in 2018 for visiting a gentleman's club with a subordinate twice in two years. (Def.'s Moving Br., Decl. of McCord ¶¶ 6-7 ("McCord Decl."), ECF No. 26-5.) Novo's counter-comparators also did not report to Pascarella or Moore. (*See id.* ¶ 4.)

The Court agrees that Etheridge's comparators are not similarly situated. In doing so, the Court looks to "factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Whitmore v. Nat'l R.R. Passenger Corp.,*

510 F. Supp. 3d 295, 306 (E.D. Pa. 2020). To be sure, Etheridge need not be "identically situated" to the other comparators but he "must nevertheless be similar in all relevant respects." *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 711 (E.D. Pa. 2012). But even on the surface, Etheridge "holds a different job in a different department" than the comparators. *Mandel*, 706 F.3d at 170. That is, from what the Court can glean, none of the comparators were in the Diabetes Education Group. (*Compare* Pl.'s Opp'n Br., Ex. 34 (comparator is a "District Business Manager II"), *with* SSMF ¶ 3 (Etheridge "was a Director of Diabetes Education").) As to the supervisors and decision-makers, Etheridge does not argue that Pascarella or Moore played any role in the comparators' disciplinary treatment. *See Vernon v. A & L Motors*, 381 F. App'x 164, 167 (3d Cir. 2010) ("[Plaintiff] performed a different job than [comparator employee] . . . for a different supervisor."); *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) ("Although there can be no per se rule that comparator evidence from employees with different supervisors is irrelevant . . . [plaintiff] failed to present evidence suggesting a link between the purported comparators and the motivations of the decision-makers who terminated [him]."). Supervisors and decision-makers aside, Etheridge engaged in different conduct than the comparators, as well. That is because the company's investigation into Ethridge's conduct found a pattern of misconduct that dated back several years and impacted multiple direct reports. The comparators, on the other hand, mostly involved one-off incidents. *Id.* at 224 (finding meaningful difference in comparators with first-time offenses versus plaintiff with multiple prior offenses). The Court therefore disagrees the comparators support Etheridge's claim.[10]

---

[10] In any event, should the Court loosen its requirements that Etheridge be similar in position and reporting chain for the purposes of comparators, Novo has presented uncontroverted evidence that a Novo manager outside of the protected class was terminated for making several sexual comments to a woman in that manager's district. (McCord Decl. ¶ 7.)

Alternatively, Etheridge claims that sufficient circumstantial evidence gives rise to an inference of discrimination to satisfy the fourth element of a *prima facie* case. (Pl.'s Opp'n Br. 7.) Specifically, he argues the following facts allow an inference of discrimination: (i) Etheridge receiving a verbal warning in April 2018 purportedly for his conduct during the Chicago drug launch despite Pascarella saying it was for other reasons; (ii) differing treatment for other employees that cheated during the drug launch conference; (iii) inconsistencies in Williams's handwritten notes that Etheridge's conduct "wasn't unwelcome[d]" versus Piccinetti's report and the termination letter stating his conduct was unwelcomed; (iv) disparities between Williams and McCord's testimony as to who first recommended Etheridge's termination; (v) Pascarella making comments to Etheridge that he was "too emotional," "very memorable," and too close to his team; (vi) Novo having knowledge that Sebastian was dishonest in his expense reports but believing him anyway about being sexually harassed; and (vii) Etheridge's believing that Moore was uncomfortable around him based on two in-person encounters.[11] (*Id.* at 7-10; Etheridge Dep. Tr. 99:6-7, 107:2-3.)

Notwithstanding that the burden of showing a *prima facie* case is "not onerous," Etheridge nonetheless fails to establish it here. *Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998). Taking all the facts in Etheridge's favor, to infer Pascarella discriminated against him because he is gay is conclusory, at best. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) ("Even in the discrimination context . . . plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."). At bottom, to demonstrate an inference of

---

[11] Etheridge also points to an event where he apparently gave a member of Human Resources an iPad for the purpose of "enjoying pornography at home." (SSMF ¶ 67.) The Court fails to see any relevance of this evidence to show disparate treatment and, in any event, that employee recused himself from Novo's investigation into Etheridge because he previously discussed Sebastian with Etheridge on multiple occasions. (Def.'s Reply Br., Ex. G., ECF No. 31-10.)

discrimination, Etheridge provides two isolated comments by Pascarella that Etheridge was "too emotional" and "too close" to his team, as well as Etheridge's belief that neither Pascarella nor Moore were comfortable around him. (Etheridge Dep. Tr. 99:6-7.) Starting with the latter, speculation that Moore and Pascarella did not like him and further that his sexual orientation played any role in that aversion is unsupported by the evidence. *But see Bullock*, 71 F. Supp. 2d at 490 ("To make out a prima facie case of discrimination requires more than such speculation."). The fact that Etheridge believed Moore avoided him in social settings on two occasions is evidence of little and is "not sufficient to overcome summary judgment." *Yu v. McGrath*, 597 F. App'x 62, 67 (3d Cir. 2014) (citing *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151 (10th Cir. 2008) (noting that employee's subjective belief in invidious nature of isolated and ambiguous comment does not support inference of discrimination)).

Further, as to the comments by Pascarella, they fail to show that Pascarella discriminated against Etheridge because he is gay. Examining the comments in context shows that they were tethered not to Etheridge's sexual orientation but rather to the incident of him cheating in Chicago to assist some of his team members. *Schug v. Pyne-Davidson Co.*, No. 99-1493, 2001 WL 34312877, at *5 (D. Conn. Dec. 10, 2001) ("[L]ike any remarks, [stray comments] must be viewed in context, along with the specific language used and the number of times the comments were made."). After all, Pascarella made these comments in the context of a conversation about the Chicago conference and subsequent verbal warning. (Etheridge Dep. Tr. 98:8-25, 99:1-25, 100:1.) And even the most insidious reading of "too emotional," made weeks before Etheridge was fired, is insufficient to carry the day. *Udoewa v. Plus4 Credit Union*, 754 F. Supp. 2d 850, 872 (S.D. Tex. 2010) (determining that isolated comment by executive vice-present and ambiguous comment by director are not enough to preclude summary judgment), *aff'd*, 457 F. App'x 391 (5th Cir.

2012); *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 351 (S.D.N.Y. 2010) (examining the "closeness in time of the [adverse] action and the remark" in determining whether a comment was "stray").

Putting it all together, both Etheridge's proffered comparators and recitation of facts leading up to his termination fall short of providing evidence that could reasonably give rise to an inference of intentional discrimination. In any event, as demonstrated below, Etheridge's suit still cannot survive summary judgment because Novo presented a legitimate reason for his termination, and he cannot show pretext.

### 2. Novo Presents a Legitimate Employment Reason.

It is uncontested that Novo's June 2018 termination letter sent to Etheridge satisfies the burden of proffering a legitimate, non-discriminatory reason. (*See* Etheridge Termination Letter ("[Etheridge] subjected direct reports to repeated unwelcome behavior and commentary of a sexual nature that made the individuals uncomfortable" and violated the company's Equal Employment Opportunity & Anti-Harassment Policy); *see also Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (stating that the employer's burden of showing a non-discriminatory reason is "relatively light").) The Court therefore finds Novo satisfied its burden.

### 3. Etheridge Fails to Show Pretext.

At the final stage, the burden swings back to Etheridge to present evidence from which a jury could conclude Novo's stated reason for firing him was "merely a pretext for discrimination." *Burton*, 707 F.3d at 426. Even if Etheridge reached this stage of the *McDonnell Douglas* test, he fails to meet this burden.

Etheridge's proffered pretext must be considered in the context of his termination. *See Fichter v. AMG Res. Corp.*, 528 F. App'x 225, 230 (3d Cir. 2013) (plaintiff must offer evidence that contradicts defendant's "core facts" for its adverse decision). Here, Novo's stated reason for

firing Etheridge was violations of the company's anti-harassment and EEO policies. (*See* Piccinetti Report, at 1.) Indeed, Etheridge admitted to Piccinetti that he acted in ways which violated company policy. (*See generally* Etheridge May 3, 2018 Interview.) Novo conducted a multi-month investigation into his conduct, interviewing several witnesses including Etheridge, before ultimately determining that he "subjected direct reports to repeated unwelcome behavior and commentary of a sexual nature that made the individuals uncomfortable." (Etheridge Termination Letter.) Further, it was reasonable for Novo to reach this conclusion since multiple of Ethridge's direct reports—not just Sebastian—had similar experiences with Etheridge that would violate Novo's anti-harassment policy. (*See* Piccinetti Report, at 1-3.)

With the stage set, the Court reviews Etheridge's evidence of pretext.  In doing so, it finds it insufficient to survive summary judgment. *First*, Etheridge attempts to muddy the waters by pointing to Williams's handwritten note that says his conduct was "not unwelcomed." (SSMF ¶ 70.) But this fails to consider that Piccinetti's report, which was the centerpiece of Novo's investigation, clearly states that the sexual conversations were "unwelcome[d]" and "created an environment that was hostile and uncomfortable." (Piccinetti Report, at 5.) Moreover, Williams testified that she jotted this one phrase down during her conversation with McCord in discussing discipline ranges. (Williams Dep. Tr. 91:1-7.) In any event, even excluding that explanation, this one isolated note—particularly considering the comprehensive investigative report saying otherwise—is far from casting meaningful doubt as to whether Novo believed Etheridge's conduct was unwanted. *Knight v. Slippery Rock Univ.*, 756 F. App'x 179, 183 (3d Cir. 2018) (noting that for an inconsistency to be material, plaintiff must demonstrate that the proffered reason "was so plainly wrong that it cannot have been the employer's real reason." (quoting *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)).  After all, Pascarella was provided Piccinetti's

investigative conclusions that there was a serious violation of company policy and that Etheridge engaged in unwanted conduct, as well as a recommendation from Employee Relations to terminate Etheridge. *Hennessey v. Dollar Bank, FSB*, 833 F. App'x 961, 966 (3d Cir. 2020) (finding inconsistency immaterial if it "does nothing to contradict the core facts on which his termination was based").

*Second*, as discussed above, the "too emotional" and "too close" comments by Pascarella in one isolated conversation are insufficient to show Novo's purported reason for terminating Etheridge was pretext. For one, Pascarella made these comments weeks before firing Etheridge. *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 74 (D.D.C. 2016) ("Stray comments lacking *any* temporal or substantive relationship to the adverse employment action are not evidence of discriminatory intent." (quoting *Francis v. Perez*, 970 F. Supp. 2d 48, 65 (D.D.C. 2013))). The comments were, at worst, ambiguous and not directly related to sexual orientation. *Adamson*, 514 F.3d at 1151 ("[I]solated and ambiguous comment is generally considered too abstract to support an inference of discrimination."); *Fuentes*, 32 F.3d at 767 (district court did "not think that a factfinder could reasonably construe these incidents, standing alone (as they do), as evidencing" bias or discrimination against a protected class member). What's more, in the weeks that followed, Williams informed Pascarella of Piccinetti's findings and jointly with McCord recommended he terminate Etheridge. The question is whether that comment would lead a "reasonable person in [Etheridge's] circumstances" to conclude he was suffering unlawful discrimination. *Moore v. City of Phila.*, 461 F.3d 331, 344 (3d Cir. 2006). Simply put, the two comments made by Pascarella do not sufficiently show pretext that undermines Novo's documented motive for firing Etheridge.

*Finally*, the Court is unpersuaded that Etheridge's verbal warning is cause for pretext. Although Ethridge's termination letter mentions "prior discipline" due to his "poor judgment and

leadership," which undoubtedly refers to the verbal warning, the termination letter in no way infers that it was the cause of his termination. (*See* Etheridge Termination Letter.) Rather, Novo's stated reason for terminating Etheridge is violating company policy and subjecting direct reports to "repeated unwelcome behavior and commentary of a sexual nature." (*Id.*) For those offenses alone, Novo policy allows for "discipline up to and including termination." (Def.'s Moving Br. Ex. A ("Novo EEO Policy"), ECF No. 26-4.)

In all, the Court finds Etheridge fails to raise sufficient evidence of pretext to survive summary judgment.

### C.   Etheridge Must Make Out a *Prima Facie* Case of Retaliation.

Etheridge also raises a claim of retaliatory firing under Title VII and NJLAD. Much like his discrimination claim, both laws analyze retaliatory claims under the *McDonnell Douglas* framework. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

In setting forth a *prima facie* case of retaliation, a plaintiff must show (1) that he engaged in "protected employee activity"; (2) an "adverse action by the employer either after or contemporaneous with the employee's protected activity"; and (3) "a causal connection between the employee's protected activity and the employer's adverse action." *Tinio v. Saint Joseph Reg'l Med. Ctr.*, 645 F. App'x 173, 176 (3d Cir. 2016) (quoting *Daniels*, 776 F.3d at 193). Protected employee activities include "participat[ing] in certain Title VII proceedings and oppos[ing] discrimination made unlawful by Title VII." *Id.* (quoting *Moore*, 461 F.3d at 341). It covers employees that file formal charges of discrimination against their employers as well as "informal protests of discriminatory employment practices, including making complaints to management." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). Adverse action is employer conduct that is "materially adverse," which means conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Finally, the plaintiff must show a causal connection between the protected activity and the adverse employment action such that "the temporal proximity between the protected activity and the adverse action is unusually suggestive*." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

Should a plaintiff establish a *prima facie* case of retaliation, the burden shifts to the defendant to "offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge." *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 235 (3d Cir. 1999) (quoting *Keller*, 130 F.3d at 1108). At this step, the defendant bears the burden of production, not the burden of persuasion. *Id.*

If the defendant satisfies this burden, "step three is reached" and to "survive summary judgment or judgment as a matter of law," the plaintiff must establish that the reasons proffered by the defendant are pretextual, and that the actual reason for the adverse action was unlawful retaliation. *Keller*, 130 F.3d at 1108.

### D.    A Factfinder Cannot Reasonably Conclude that Novo Retaliated Against Etheridge for Protected Activity.

Etheridge argues that Novo retaliated against him for going to Pascarella and Employee Relations during the investigation into his own misconduct. His claim fails for several reasons. For starters, Etheridge's retaliation claim stumbles out of the gate because he cannot manufacture protected activity by bringing allegations against him for sexual harassment to Novo's attention. Such events are far afield from Etheridge reporting that *he* was sexually harassed or that *he* observed someone else doing the harassing. In those circumstances, Etheridge would have a plausible argument that he "opposed" the unlawful actions. *Selvanathan v. Opportunities Industrialization Ctrs. Int'l*, 871 F. Supp. 2d 349, 367 (E.D. Pa. 2012) ("The Third Circuit has

described . . . protected activity as "'*oppos[ing]* any practice made unlawful' by [Title VII]." (emphasis added)). But the facts unambiguously show that Etheridge was instead concerned with the status of the investigation into his own conduct. Quite understandable. But pressuring Novo to expedite the process or provide an update is not protected activity. Because it was not protected activity, Pascarella informing Etheridge that he should stop pressuring Human Resources for updates on the investigation was not unlawful retaliation.

At most, Etheridge raised concerns that Sebastian made false allegations against him, and Novo was not acting quickly enough to clear his name. But reporting slander does not equate to protected activity. *Selvanathan*, 871 F. Supp. 2d at 367 (finding plaintiff's allegation of "defamation charges and grievances" insufficient to invoke age discrimination). Moreover, "[a] general complaint of unfair treatment does not translate into a charge of illegal [sexual orientation] discrimination." *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995). It is true that Etheridge interjected comments about his status as a gay man into conversations with Pascarella and Williams regarding the sexual misconduct allegations. The mere mention of a protected class alone, however, does not transform a general grievance into opposing unlawful activity under Title VII. *Perry v. Harvey*, 332 F. App'x 728, 733 (3d Cir. 2009) (declining to turn general list of grievances into protected activity under Title VII solely based on plaintiff's "oblique references" of discrimination and race). Nor does Etheridge provide any evidence that investigations into other employees' misconduct was expedited.

Relatedly, Etheridge fails the second element, as well, because his termination was not connected to pressing Human Resources about the sexual misconduct investigation. *Ramon v. Lee*, 304 F.3d 473, 476 (5th Cir. 2002) ("Because [plaintiff] has not carried his burden of demonstrating that [his] speech, rather than his own misconduct, was the motivating factor leading to his

discharge, summary judgment was proper."). Considering all the evidence presented "as a whole," Etheridge fails to demonstrate any facts that support his theory. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). Although Novo could have reasonably concluded that Etheridge was attempting to impede or obstruct the investigation into his own misconduct, it neither mentioned that fact in its termination letter nor did any Novo employee testify that it impacted the company's decision.[12]

Thus, the Court finds that Etheridge failed to raise a *prima facie* case of retaliation.

IV.   **CONCLUSION**

The questions before the Court are straightforward: Taking all facts in a light most favorable to Etheridge, did he present sufficient evidence such that a reasonable factfinder could conclude that he was terminated based on his sexual orientation or that Novo engaged in retaliatory conduct against him? The Court answers those questions in the negative. The Court thus grants Novo's Motion for Summary Judgment. An Order consistent with this Memorandum Opinion will follow.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[12] Etheridge does not allege that Novo retaliated against him in giving a verbal warning in April 2018, and, thus, the Court focuses on the events surrounding his termination. (*See* Pl.'s Opp'n Br. 11-13.)